STUART GREENFIELD AND EILEEN GREENFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greenfield v. Commissioner
Docket No. 6354-70.
United States Tax Court
T.C. Memo 1978-251; 1978 Tax Ct. Memo LEXIS 261; 37 T.C.M. (CCH) 1082; T.C.M. (RIA) 78251; July 10, 1978, Filed *261 Held, petitioner's receipt of 385,000 shares of Industries stock in 1968 was a taxable event. John Kennedy Lynch, for the petitioners. Steedly Young, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Fraud Penalty Year
Deficiency
Sec. 6653(b)[1]
1966
$ 2,689.92
$ 1,344.96
1967
1,177.07
588.54
1968
410,210.98
207,001.63
All issues have been settled but one: we must decide whether petitioner's receipt of 385,000 shares of Meter Maid Industries stock in 1968 was a taxable event. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. Petitioners, Stuart and Eileen Greenfield, were husband and wife when they filed their 1966 and 1967 joint Federal income tax returns with the District Director of Internal Revenue, Jacksonville, Florida, and when they filed their joint 1968 Federal income tax return with the Internal Revenue Service Center, Chamblee, Georgia. Petitioners were legal residents of Miami, Florida, when they filed their petition herein. During 1966 Stuart *262 Greenfield (hereinafter petitioner) and his wife Eileen started a company, Meter Maid Laundries, Inc. (hereinafter Laundries). Laundries installed and maintained coin-operated washing machines in apartment buildings. Although Laundries was profitable, petitioner found its growth very slow because of insufficient operating capital. As a result, during the summer of 1967 he telephoned Arthur Burrell, a long-time acquaintance who was employed by a local brokerage firm, and asked him if he knew of any small public companies that were "in trouble" and could be acquired without any cash. Burrell found about six of them, and recommended that petitioner especially consider one, North American Cigarette Manufacturers, Inc. (hereinafter Cigarette). As part of his efforts, Burrell contacted and met with Cigarette's president, Joel Rubin. He discussed Cigarette's finances, its outstanding stock, etc. After the meeting with Rubin, Burrell contacted petitioner and gave him the information concerning Cigarette. Petitioner, upon hearing the details on Cigarette, asked Burrell to arrange a meeting with Rubin which Burrell did. Subsequently, on January 15, 1968, Cigarette and Laundries entered *263 into a preliminary merger agreement under which all of the outstanding Laundries stock would be purchased by Cigarette for 3,000,000 shares of Cigarette stock. The third paragraph of this preliminary agreement read: It is further agreed and understood that Mr. Arthur Burrell is to be issued and delivered Five Hundred Thousand (500,000) shares of common stock of North American Cigarette Manufacturers, Inc., said stock on this date is quoted by National Quotation "Pink Sheets" as bidding.06 2/3 cents and offered at.12 1/2 cents; for causing the above mentioned parties to enter into the above mentioned transaction. [Emphasis added.] This preliminary agreement was signed by Joel Rubin, Cigarette's chairman; petitioner, Laundries' president; Eugene Gluck, Laundries' secretary; and witnessed by petitioner's wife and Burrell. By letter dated January 31, 1968, addressed to Burrell, signed by petitioner and Gluck, and accepted by Burrell, the above agreement was modified by the amount of stock Burrell was to receive: This letter will confirm to you that Meter Maid Laundries, Inc., a Florida corporation, agrees to deliver to you the total sum of Six Hundred Thousand (600,000) *264 shares of North American Tobacco Manufacturers, Inc. [sic], a Delaware corporation; common stock. This stock is acknowledged to be part of the total number of shares that will be delivered to Meter Maid Laundries, Inc. referring to a letter agreement dated January 15, 1968, between North American Tobacco Manufacturers, Inc. and Meter Maid Laundries, Inc., and signed by an Officer of both corporations. It is further agreed that if the above mentioned Agreement for Exchange of Stock is not consummated, my agreement with you for delivery of the 600,000 shares of stock shall be declared null and void. If this is in accordance with your understanding, will you kindly indicate your acceptance of the above offer by signing at the place provided and return the copy of this letter to me. As anticipated, the merger occurred in early 1968, and Burrell received 600,000 shares of Cigarette stock. Cigarette's name was later changed to Meter Maid Industries, Inc. (hereinafter Industries), so that Burrell became the owner of 600,000 shares of Industries stock. Following the merger of Laundries and Cigarette, Burrell left the brokerage firm that had previously employed him. At petitioner's *265 request, Burrell started helping out around Industries' offices about twice a week. Because of his securities knowledge Burrell helped Industries maintain its stock transfer journals. For his services, however, Burrell was not paid. In fact his main interest in helping was to enhance the value of his 600,000 shares of Industries stock, which equalled 20 percent of Industries outstanding stock. The arrangement between Burrell and Industries did not last long. During the summer of 1968 petitioner became suspicious that Burrell had been improperly transferring his restricted stock into unrestricted shares, and then subsequently selling some of the newly issued, unrestricted stock. Petitioner was also concerned that Burrell may have been stealing stock certificates. Because of Burrell's questionable dealings with the Industries stock, petitioner changed the locks on Industries' offices and refused to allow Burrell further access to the stock transfer journal. Petitioner then met with Burrell and demanded that Burrell return all his Industries stock. Petitioner physically threatened Burrell and threatened to expose Burrell to the authorities if Burrell refused to return the 600,000 *266 shares of Industries stock. Later, shortly after September 2, 1968, Burrell returned to petitioner 385,000 shares of Industries stock endorsed in blank, all that he still owned. On September 11, 1968, 120,000 shares of the recently returned 385,000 shares of stock were transferred into unrestricted Industries stock bearing petitioner's name. Petitioner subsequently used 10,000 shares as collateral for a personal bank loan on which petitioner later forfeited. The 10,000 shares collateral were sold to satisfy the debt. Another 30,000 shares of stock were used to obtain a loan from the National Industrial Bank of Miami. None of the 385,000 shares of stock Burrell gave to Greenfield was ever transferred back to Industries as treasury stock. Rather, all the stock remained in petitioner's possession and was treated as his own.Except for the 120,000 shares transferred to petitioner, none of the remaining shares was transferred on Industries' books. In his notice of deficiency, dated July 23, 1970, respondent stated, "It is determined that during the taxable year 1968 you received the taxable income by receipt of 385,000 shares of stock of Meter Maid Industries, Inc. * * *. Therefore, *267 your taxable income is increased * * *." Three primary witnesses in this case, petitioner, Burrell, and Rubin have been convicted of various criminal charges. Petitioner, after jury trial, was convicted of willfully attempting to evade his and his wife's 1968 income taxes. Burrell, after jury trial, was convicted of willfully making and subscribing his 1967 and 1968 Federal income tax returns, knowing they were not true and correct, and willfully attempting to evade his 1968 Federal income taxes. Rubin was convicted on five counts of forging endorsements on United States Savings bonds. All appeal efforts for these three individuals have failed. ULTIMATE FINDING OF FACT Petitioner's receipt of 385,000 shares of Industries stock from Arthur Burrell was a taxable event. OPINION We must determine whether petitioner's receipt of 385,000 shares of Industries stock from Burrell in 1968 was a taxable event. Petitioner contends that Industries gave Burrell an advance of 600,000 shares of Industries stock for services to be rendered in the future. When Burrell failed to properly perform the anticipated services he was required to return the unearned shares to the corporation. *268 Petitioner therefore asserts that his role in receiving the shares from Burrell was that of an agent for the corporation: although Burrell had possession of the Industries stock, he never legally owned it; when he failed to perform the anticipated services he was required to release possession of the corporation's stock; in doing so petitioner took possession of the corporation's stock only as a representative of the corporation. Respondent contends that Burrell received the 600,000 shares of stock as a finder's fee, and that Burrell had exclusive right and ownership to that stock following the merger of Laundries into Cigarette. Subsequently, respondent contends, petitioner threatened legal action and physical harm to coerce Burrell to transfer the stock to petitioner. Petitioner then took possession of the stock, had no intention of returning it to the corporation, had some of it transferred to his name, and used some of the stock for his personal loans. In sum, respondent contends Burrell had the legal right to exclusive ownership to the stock and, following threats made by petitioner, Burrell transferred the stock to petitioner who kept it for his own use. Under such circumstances *269 petitioner would be required to include in income the value of the 385,000 shares of stock. See . The question before us is strictly a factual one turning on the characterization of two events: did Burrell receive 600,000 shares of Industries stock as a finder's fee or was it an advance for services to be rendered; also, when Burrell gave the 385,000 shares of stock to petitioner, did petitioner receive the stock as an agent for the corporation. Unfortunately, the record presented by the parties is conflicting, contradictory and inconsistent. The credibility of the parties' key witnesses -- those most capable of explaining the events occurring in 1968 -- is questionable. Burrell, respondent's main witness, petitioner and Rubin, petitioner's key witnesses, have all been convicted of various crimes. As this Court described a similar situation in : This case epitomizes the ultimate task of a trier of the facts -- the distillation of truth from falsehood which is the daily grist of judicial life. He must be careful to avoid making the courtroom a haven for *270 the skillful liar or a quagmire in which the honest litigant is swallowed up. Truth itself is never in doubt, but it often has an elusive quality which makes the search for it fraught with difficulty. That this is so is clearly illustrated by the situation herein. Many of the objective facts are as consistent with a finding that the lottery tickets belonged to petitioner as they are with a finding that they belonged to his uncle, Jose; indeed, some of these facts support the former conclusion, for which respondent strenuously contends. If this were all we had to go on, we would be inclined to hold that petitioner had failed to sustain his burden of proof. But we also have before us an extensive transcript of oral testimony. The question is whose testimony and how much of it should we believe. After considering the entire record, the credibility of the witnesses and documents and records submitted to the Court, we conclude petitioner's receipt of 385,000 shares of Industries stock was a taxable event, and he must include in this 1968 gross income the stipulated value of that stock when received. Our conclusion is based on a variety of factors a few of which we shall mention: *271 first, petitioner never adequately explained documents dated January 15, 1968 and January 31, 1968, which specifically state that Burrell received his 600,000 shares of stock for bringing Laundries and Cigarette together. These documents support respondent's theory that Burrell received his stock as a finder's fee. Second, although petitioner argues Burrell was not entitled to his stock until he performed certain services, the stock owned by Burrell was unqualifiedly his upon receipt: it was transferred to him in the stock transfer book, the certificates bear his name, and petitioner can point to no written agreement requiring Burrell to return the stock in the event certain future services were not satisfactorily performed. Third, when Burrell gave the stock to petitioner, they were endorsed in blank and came under petitioner's exclusive control. Petitioner made no effort to transfer the certificates to the corporation. In fact, 120,000 shares were reissued in petitioner's name and some shares were clearly used to satisfy petitioner's personal obligations. Finally, had Burrell been given the 600,000 shares of stock as an advance on services to be rendered and had he failed *272 to perform those services, we believe he would have been required to return all shares advanced, not just the remaining 385,000. There is no indication, however, that Burrell was required to reimburse the corporation for the shares he had already sold. These factors, and others, persuade us that petitioner must include in his 1968 income the stipulated value of the 385,000 shares of Industries stock received from Burrell. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩